UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| *In re* J & J Pizza, Inc<br><br>Debtor. | MEMORANDUM<br><br>Civil Action No.<br>21-cv-13729-PGS |

This matter comes before the Court on an appeal from the United States Bankruptcy Court for the District of New Jersey ("Bankruptcy Court") by *pro se* appellant Steven D'Agostino ("D'Agostino"). (Notice of Appeal, ECF No. 1). D'Agostino, an alleged creditor of debtor J & J Pizza, Inc. ("Debtor"), challenges the Bankruptcy Court's May 26, 2021 Order Confirming Debtor's Chapter 11 Plan of Reorganization, as modified by the Bankruptcy Court's July 6, 2021 Order Granting Reconsideration in Part, as "essentially arbitrary, capricious, and unreasonable." (D'Agostino Brief at 1-2, ECF No. 4). Further, D'Agostino argues that his future claim against the Debtor, through his pending lawsuit against the Debtor,[1] should not be impaired by the Chapter 11 plan. *Id.* For the reasons set forth below, the Court will affirm the Bankruptcy Court's decision to confirm the Debtor's Chapter 11 plan.

---

[1] 3:17-cv-11603-PGS-TJB.

1

# I.

The Debtor is the operator of a Domino's Pizza franchise in Little Egg Harbor, New Jersey. (Third Amended Small Business Debtor's Plan of Reorganization at 7, Bankruptcy ECF No. 81).[2] The Debtor's co-shareholders, brothers John and Jason Parmer, operated the business together. *Id.* at 9. John Parmer, who "was responsible for the handling of the books and records of the Debtor," died on December 20, 2019, leaving behind "notes indicating that he had committed suicide" and that he had "put [the Debtor] in a lot of debt." *Id.*

After examining the Debtor's business records, Jason Parmer found that his brother John had withdrawn numerous unauthorized amounts from the Debtor's bank account for John's personal use. *Id.* at 9-10. In addition, John had also acquired several unauthorized loans on behalf of the Debtor. *Id.* Evidently, John was day trading and lost a substantial sum of money, including the amounts from the unauthorized loans. (Aug. 16, 2022 T. 19:13-15). The repayment of the loans undermined the Debtor's financial stability, prompting it to seek shelter under Chapter 11 bankruptcy. *Id.* On December 23, 2020, the Debtor filed a voluntary Chapter 11 petition with the Bankruptcy Court. (Bankruptcy ECF No. 1).

D'Agostino is a former employee of the Debtor who worked as a delivery driver for approximately six months between September 2014 and March 2015. (ECF

---

[2] Where the Court cites to filings from the bankruptcy proceedings, 20-23856-MBK, instead of the current docket, the Court will indicate such with "Bankruptcy ECF No."

No. 1, 3:17-cv-11603-PGS-TJB). Following termination of his employment in or around March 2015, D'Agostino filed a lawsuit against the Debtor, alleging in part that John Parmer had repeatedly made offensive comments about D'Agostino's sexual orientation. *Id.* The lawsuit remains pending and so on February 16, 2021, the Debtor filed an Amended Schedule E/F of Creditors listing D'Agostino as a creditor with an unsecured claim, one that was contingent, unliquidated, and disputed in an unknown amount. (Bankruptcy ECF No. 48).

The Debtor filed its Chapter 11 Subchapter V Plan of Reorganization ("the Original Plan") (Bankruptcy ECF No. 67) on March 23, 2021, later filing amended versions of the plan on:

- March 24, 2021 ("the First Amended Plan") (Bankruptcy ECF No. 70);
- April 26, 2021 ("the Second Amended Plan") (Bankruptcy ECF No. 79); and
- April 27, 2021 ("the Third Amended Plan") (Bankruptcy ECF No. 81).

On May 19, 2021, the Debtor filed a Certification of Balloting, certifying that a total of three (3) ballots were returned. (Bankruptcy ECF Nos. 90, 92). The Debtor certified that two impaired Class 2 creditors and one impaired Class 5 general unsecured creditor all voted to accept the Third Amended Plan. *Id.*

On May 20, 2021, the Bankruptcy Court heard arguments on confirmation of the Third Amended Plan, overruled D'Agostino's objections on the record, and approved the Third Amended Plan pursuant to 11 U.S.C. §1191(b) cramdown, memorializing such in its May 26, 2021 Order Confirming Debtor's Chapter 11 Plan

of Reorganization. (ECF No. 1; Bankruptcy ECF No. 98) ("the Confirmation Order"). In doing so, the Bankruptcy Court: (1) recognized that D'Agostino held only an "unliquidated, disputed claim" which precluded his eligibility to cast a ballot; (2) held D'Agostino would be permitted a limited stay to continue his civil litigation against the Debtor "for the purpose of determining and liquidating his claim"; and (3) stipulated that the Debtor could not "make any distributions to general unsecured creditors under the [confirmed] Plan unless Mr. D'Agostino's potential pro-rata share is preserved in the escrow account of the Disbursing Agent." *Id.*

On June 8, 2021, D'Agostino filed a motion for reconsideration of the Confirmation Order. (Bankruptcy ECF No. 107). The Bankruptcy Court heard arguments on July 1, 2021 and denied reconsideration save one exception memorialized in its July 6, 2021 Order Granting Reconsideration in Part ("the Reconsideration Order"):

> To the extent Mr. D'Agostino's claim is liquidated and fixed in an amount greater than the currently estimated $1 million, the Debtor shall be responsible and obligated to pay Mr. D'Agostino his claim as fixed, but capped at the pro-rata share of the base sum to be distributed to all general unsecured creditors.

(ECF No. 1; Bankruptcy ECF No. 115). D'Agostino thereafter filed the instant notice of appeal on July 14, 2021 (ECF No. 1; Bankruptcy ECF No. 124) and the Court heard oral argument from the parties on August 16, 2022.

4

## II.

This Court has appellate jurisdiction over the present matter under 28 U.S.C. § 158(a). In exercising appellate review, the Court reviews the Bankruptcy Court's legal determinations de novo, factual findings for clear error, and exercises of discretion for abuse thereof. *See Hefta v. Official Comm. of Unsecured Creditors (In re Am. Classic Voyages Co.)*, 405 F.3d 127, 130 (3d Cir. 2005) (internal citation omitted).

A finding of fact "is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer, N.C.*, 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 68 (1948)) (internal quotations omitted).

"Judicial discretion is abused only when the court acts in an arbitrary, fanciful or unreasonable manner or where it uses improper legal standards, criteria or procedures." *Peshkopia v. Katz (In re Kara Homes, Inc.)*, 2010 U.S. Dist. LEXIS 61411, at *13 (D.N.J. June 21, 2010) (internal citation and quotation omitted). A "bankruptcy court abuses its discretion only if no reasonable person could take the view it adopted," meaning that that if "reasonable minds could differ, then it cannot

be said the [bankruptcy court] abused its discretion." *Id.* (internal citation and quotation omitted).

### III.

Pursuant to Federal Rule of Bankruptcy 8009(a)(1)(A), D'Agostino filed the required Record on Appeal and Statement of Issues, presenting the current issues as follows:

1) For multiple reasons, the Bankruptcy Court should not have confirmed the proposed Chapter 11 plan; and
2) For multiple reasons, [D'Agostino]'s future claim (i.e. his pending lawsuit) against [J & J Pizza, LLC] should not have been impacted (impaired) at all by any Chapter 11 plan.

(ECF No. 3). D'Agostino then lists multiple arguments supporting each of the above points. (D'Agostino Brief at 1-9). The arguments are reviewed as set forth in the brief.

<u>1.A. "The proposed Chapter 11 plan was essentially arbitrary, capricious and unreasonable"</u>

D'Agostino first argues that the Third Amended Plan, was so "hastily and haphazardly prepared" that it "contained multiple math mistakes, it failed to reflect any valid basis for its treatment of the creditors, it was inconsistent with itself, and it was further inconsistent with (purported) facts that had been stated in earlier versions of the Plan[.]" (D'Agostino Brief at 2). D'Agostino proffers multiple alleged inconsistencies, including in part:

- The Original Plan allotted $230,752.26 in total base dividend payment to general unsecured creditors (Bankruptcy ECF No. 67), but this amount was reduced to $145,054.00 in the First Amended Plan (Bankruptcy ECF No. 70) without any "rhyme or reason behind the debtor's selection of this amount" and which remained in the Third Amended Plan.

- The Second Amended Plan indicated that the general unsecured claims totaled $681,877.71 (Bankruptcy ECF No. 79) but was later increased in the Third Amended Plan to $743.533.05. (Bankruptcy ECF No. 81).

- The Original Plan, First Amended Plan, and Second Amended Plan each listed creditor Swift Financial as having a secured UCC-lien in the amount of $67,506.22 (Bankruptcy ECF Nos. 67, 70, 79), but was reduced in the Third Amended Plan to $33,592.28. (Bankruptcy ECF No. 81).

(D'Agostino Brief at 2-3). In sum, D'Agostino argues that the Bankruptcy Court erred by confirming the Third Amended Plan despite these alleged inconsistencies. (D'Agostino Brief at 4). Further, he avers that any reliance by the Bankruptcy Court on the endorsement of the Third Amended Plan by U.S. Trustee Lauren Bielskie and Subchapter V Trustee Brian Hofmeister should be discounted because the "U.S. trustee had delegated to Hofmeister the duty to the verify the Plan" which "he clearly failed to do … because he simply wanted to take the easiest path forward as possible to earn his fee[.]" (D'Agostino Reply at 3, ECF No. 7; May 20, 2021 T. 27:6-9). The Court is not persuaded.

 As counsel for the Debtor pointed out, the ordinary practice before the Bankruptcy Court is that creditors may file numerous proofs of claims as the facts change and as the bankruptcy proceedings progress, eventually leading to an

7

amended plan. (Debtor Opp. at 12, ECF No. 6). "[T]he heart of the [C]hapter 11 case is the negotiation and confirmation of a plan … Chapter 11 is designed to encourage the development of a negotiated plan of reorganization." *See* 12 Business Organizations with Tax Planning § 157.02[1] (2022).

In this case, Debtor's counsel Marc Capone specifically responded to D'Agostino's mathematical objections, noting that the Original Plan was drafted using contemporary cash flow projections, initial claim estimates, approximate cash on hand, and other similar figures. (Aug. 16, 2022 T. 12:14-13:17). Mr. Capone then explained how many of the monetary figures changed due to new filings or facts, such as an anticipated July 2021 construction loan reducing the proposed dividend payment for general unsecured creditors (*Id.* at 17:9-19) or the bifurcation of select creditors' claims into secured and unsecured portions which increased the total general unsecured claims amount. (*Id.* at 15:1-11). Accordingly, there is nothing arbitrary or capricious about the Bankruptcy Court's judgment based upon multiple plans.

At the May 20, 2021 hearing to confirm the Third Amended Plan, the Bankruptcy Court indicated that it had carefully reviewed the plan's terms and found that there was "no question that the disposable income [of the Debtor] supports the plan." (May 20, 2021 T. 27:10-11). It also reviewed the plan's Chapter 7 liquidation scenario and concluded it would poorly serve the Debtor's unsecured creditors by

offering minimal value, thus supporting confirmation of the negotiated Third Amended Plan. *Id.* at 27:14-25. Having explained such on the record and later memorialized in the Confirmation Order that all applicable provisions of 11 U.S.C. § 1129 were satisfied except § 1129(a)(8) and that the plan was "fair and equitable with respect to each impaired class of creditors," one cannot conclude that the Bankruptcy Court abused its discretion in confirming the plan. D'Agostino's allegation that the Third Amended Plan was "hastily . . . prepared" with multiple math mistakes thus lacks merit, particularly since Mr. Capone explained such amendments are common practice in bankruptcy proceedings as the parties negotiate their positions.

<u>1.B. "The debtor had (and still has) the ability to pay the full amount owed to the creditors"</u>

D'Agostino next argues that confirmation of the plan was improper because the Debtor's annual net profits prior to bankruptcy were between $65,000 and $200,000 a year, totals he suggests are high enough that more severe measures should have been made part of the confirmed plan. (D'Agostino Brief at 4-5). He advocates that because "the debtor is really just a theoretical entity … any reasonable Chapter 11 plan should have required the entity to operate at or near a 'break even' point during the duration of the Plan, with most/all of the net profits going to repay the defrauded creditors." *Id.* To implement the above, D'Agostino argues that the Bankruptcy Court abused its discretion by failing to either: (1) remove Jason Parmer from the Debtor's operations for being "asleep at the wheel" and missing his brother's misconduct; or

9

(2) reducing Jason Parmer's approximately $100,000 annual salary by $50,000 in order to boost the plan's total base dividend amount. *Id.*

Where D'Agostino has failed to cite any cases indicating that such measures are required in similar circumstances, one cannot find that the Bankruptcy Court abused its discretion in confirming the plan with Jason Parmer's salary approximating $100,000. The Bankruptcy Court adopted Mr. Hofmeister's assessment that Jason Parmer's salary was reasonable. (May 20, 2021 T. 28:20-24). Consequently, despite Mr. D'Agostino's objection, there is nothing arbitrary and capricious in the Bankruptcy Court's decision.

2.A. "The Chapter 11 filing had nothing to do with [D'Agostino]"

Regarding the second issue on appeal, the impairment of his future claim against Debtor due to the Chapter 11 plan, D'Agostino's first argument consists of a generalized objection that he did nothing to prompt the Debtor's bankruptcy but is now being forced to accept less than what he claims to be owed. Although the confirmed plan would offer "about 8 or 9 cents on the dollar" to both he and the five lenders who improperly gave loans to John Parmer, he argues that the bankruptcy was the fault of the five lenders and thus they "chose to [accept the lower amount]." (D'Agostino Brief at 6). He believes that the bankruptcy proceedings should not affect him since he has done nothing wrong and because his claim "has not even accrued yet." He cites no legal authority.

The bankruptcy code requires debtors to file a list of creditors and a schedule of assets and liabilities. 11 U.S.C. § 521(a)(1). Given D'Agostino's pending suit against it, the Debtor properly included D'Agostino in its Amended Schedule E/F as a nonpriority, unsecured creditor with a contingent, unliquidated, and disputed claim. (Bankruptcy ECF No. 48). The Bankruptcy Court determined that there was "no right under law or facts to treat Mr. D'Agostino's claim differently or outside of the Chapter 11 process" (July 1, 2021 T. 13:5-12) and D'Agostino has proffered no legal authority here or at oral argument to conclude otherwise.

2.B. "Nobody else besides [D'Agostino] is being forced to accept anything less than the full amounts owed"

D'Agostino next asserts that impairment of his claim is improper because he is the one creditor who allegedly did nothing wrong but would nonetheless be forced to accept less than his full claim. (D'Agostino Brief at 6-7). He appears to argue that although the five defrauded lenders did not object to the proposed plan paying them less than their full claims, "they chose to do so" because they "are standing in a compromised legal position" following their carelessness in making loans to John Parmer. *Id.* He concludes the argument by noting that other liabilities like the Domino's franchise fees, insurance premiums, and food supplier bills would be paid in full, leaving him (D'Agostino) as the one creditor who did "nothing to compromise [his] own legal position" but would still have to accept a discounted payment. *Id.* This appears to be a generalized argument about fairness to creditors, but it is

minimally persuasive in light of the policies and purpose behind Bankruptcy Court. To the contrary, the Bankruptcy Court found that a liquidation would be of minimal value to the Debtor's creditors and that continued operation under the Third Amended Plan would actually be most favorable for all parties, thus meriting a cramdown over any objections the lenders may have had. (May 20, 2021 T. 27:10-28:15).

Regarding D'Agostino's other point, the Court is satisfied with Mr. Capone's explanation at oral argument that the Debtor was not really behind on payment to any business-related vendors and that the few payments to those vendors in the approved plans were for invoices incurred after the initiation of bankruptcy proceedings. (Aug. 16, 2022 T. 20:18-21:10). Further, any additional payments to those assorted vendors would be necessary to continue operations (per the confirmed plan) and facilitate the approved payments to other creditors. Beyond this, D'Agostino fails to cite any legal authority requiring alternate treatment of unsecured creditors under similar circumstances that would necessitate action.

2.C. "[D'Agostino has] another source from which [he] can collect the full amount of [his] future claim"

D'Agostino's third argument rests upon the Debtor's commercial general liability ("CGL") policy of Liberty Mutual. (D'Agostino Brief at 7-8). Since the Debtor's CGL policy has a $1 million limit, the same amount stated in D'Agostino's proof of claim, he asserts that he "can get the full amount of [his] claim directly from

12

the carrier, so there is no need for [his] claim to be impaired" at all. *Id.*  D'Agostino misses the point.³

At oral argument, Mr. Capone represented that the confirmed plan did not affect D'Agostino's litigation, and if successful, any indemnification under the CGL policy. (Aug. 16, 2022 T. 22:12-22; 23:18-24:5). Since the CGL was not part of the approved plan, D'Agostino may proceed against the policy up to the maximum amount of insurance ($1 million). If the liquidated claim exceeds $1 million, then the excess amount may be subject to the terms of the approved plan.

2.D. "Other reasons why [D'Agostino's] claim should be treated as unimpaired"

D'Agostino's final argument is a catch-all fairness assertion, namely that he wanted to "simply [be left] out of the Plan," offering to certify and stipulate that his pending lawsuit "would not interfere with [the] bankruptcy petition in any way" were his potential future claim left unimpaired, but still nonetheless ending up with a impaired claim ineligible for collection until 2026. (D'Agostino Brief at 8-9). By contrast, Mr. Capone represented at oral argument that D'Agostino's pro rata share is set to be preserved in escrow by Mr. Hoffmeister so that D'Agostino can collect his

---

³ Rather than cite any legal authority demonstrating how the Bankruptcy Court was mistaken or how the presence of an insurance policy alters the impairment of unsecured claims in bankruptcy proceedings, D'Agostino instead simply cites an assortment of New Jersey state cases pertaining to excess liability and the assignment of claims from an insured entity to a successful claimant. (D'Agostino Brief at 7-8) (citing *Rova Farms Resort v. Investors Ins. Co.*, 65 N.J. 474 (1974); *Fireman's Fund Ins. Co. v. Security Ins. Co. of Hartford*, 72 N.J. 63 (1976); *Murray v. Allstate Ins. Co.*, 209 N.J. Super. 163 (App.Div.1986); *Biasi v. Allstate Ins. Co.*, 104 N.J. Super. 155 (App.Div. 1969)).

share as soon as he liquidates his claim. (August 16, 2022 T. 22:4-11). Based on Mr. Capone's representation that collection could begin prior to 2026 and absent legal authority directing an alternate result, D'Agostino has shown no reason for this Court to disturb the Bankruptcy Court's decision.

Relying on the consensual, negotiated terms of the assorted plans, the endorsement of Subchapter V Trustee Mr. Hofmeister (May 20, 2021 T. 15:11-16), the endorsement of U.S. Trustee Ms. Bielskie (May 20, 2021 T. 15:22-16:3), and its own expertise, the Bankruptcy Court confirmed the proposed plan and I find no error or abuse of discretion warranting reversal. The Bankruptcy Court's Confirmation Order and Reconsideration Order are affirmed.

## IV.

For the above reasons and considerations, Appellant Steven D'Agostino's appeal is denied and the Bankruptcy Court's May 26, 2021 Order Confirming Debtor's Chapter 11 Plan of Reorganization and July 6, 2021 Order Granting Reconsideration in Part and Amending Order Confirming Debtor's Chapter 11 Plan of Reorganization are affirmed. A separate order will follow.

s/*Peter G. Sheridan*  
PETER G. SHERIDAN, U.S.D.J.

September 6, 2022